UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| V. | ) | No. 2:09-CR-45 |
| | ) | |
| SUNNAH MADDOX, *ET AL.* | ) | |

**<u>REPORT AND RECOMMENDATION</u>**

The defendant Maddox has filed a motion to dismiss the indictment filed against him with prejudice, Document 220, claiming that he was denied equal protection of the laws because African-Americans were systematically excluded from the Grand Jury that indicted him, as well as from service as Grand Jury foreperson. This motion has been referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b).

At the direction of this magistrate judge, John Medearis, Chief Deputy Clerk for the Eastern District of Tennessee, prepared and filed an affidavit which describes the specific procedure used in 2005 to fill the Master Jury Wheel and the Qualified Jury Wheel, from which were drawn the names of the Grand Jury which indicted defendant.[1]

As relevant to defendant's motion, there have been two plans implemented by the Eastern District of Tennessee as required by the Jury Selection and Service Act[2] for the

---

[1]Doc. 294.

[2]28 U.S.C. § 1861, *et. seq*.

selection of grand and petit jurors: the Jury Management Plan as revised February 16, 2005, and the Jury Selection Plan as revised February 24, 2009. Those Plans are filed as Exhibits A and B to Mr. Medearis' affidavit. Although there are differences between the two plans, the basic scheme of both plans is random selection of potential jurors from the voter registration lists of the ten counties of the Northeastern Division.

Form JS-12 and its successor, AO-12, specifies the information to be collected that the district courts use to aid them in determining whether their jury wheels comply with the randomness and nondiscrimination provisions of the Jury Selection and Service Act, as well as comparing statistical samplings of the jury wheels against general population data. The two forms relevant to defendant's motion are the Report On Operation Of The Jury Selection Plan regarding the master jury wheel that was filled on March 21, 2005, and the Report on Operation of the Jury Selection Plan with regard to the filling of the master jury wheel on June 30, 2009. Those two reports are attached as Exhibits C and D to Mr. Medearis' affidavit.

A defendant has the right to trial by a jury selected from a fair cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 363 (1979). In this same vein, "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts . . . on account of race, color, religion, sex, national original, or economic status." 28 U.S.C. § 1862. Each district court is required to devise and implement a written plan for random selection of grand and petit juries, 28 U.S.C. § 1863, which this court has done.

In order to establish a *prima facie* violation of the fair-cross-section

> requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group of the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364.

> [I]n order to show that an Equal Protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against the delineated class. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Constaneda v. Partido*, 430 U.S. 482, 494 (1977), [internal citations and footnote omitted].

Defendant is African-American, and the court takes judicial notice that African-Americans are a recognized and distinct class. Thus, the question is whether the jury selection procedure utilized by this court since 2005 has resulted in a substantial underrepresentation of the African-American race.

This defendant was indicted in May 2009. The Grand Jury which indicted him was impaneled on May 13, 2008, and those jurors were drawn from the Master Jury Wheel filled on March 21, 2005, in accordance with the Jury Management Plan as revised February 16, 2005.

The upshot of Mr. Medearis' affidavit is that this court selected all names for inclusion in the master wheel utterly at random from voter lists using computer software, and that the inclusion and number of persons on the Master Wheel from any ethnic group was purely a matter of chance. The same is true regarding names picked from the Master Wheel for placement in the Qualified Jury Wheel. Then, a computer program randomly selected names for grand and petit jury service from the Qualified Jury Wheel to be summonsed for service on the grand jury and petit jury. The same procedure, with only minor variations of no significance, were used with respect to the 2009 filling of the Master Wheel.

In a reply brief,[3] defendant has attached as exhibits (1) the affidavit of Guy Blackwell, a former assistant United States Attorney in this district, (2) 2009 *estimated* demographic information obtained from the Census Bureau *via* the Internet, and (3) demographic information generated by the 2000 Census..

In his affidavit, Mr. Blackwell recites that he served as an assistant United States Attorney from February 1978 until January 2007, and, over that lengthy period of time, he worked closely with federal grand juries in the Northeastern Division of this court. Although noting that he does not possess documentation regarding the actual numbers involved, it is his recollection that the pool of grand jurors in this division included approximately 40 people at any given time, and that the pool changed "about once per year." Based on this recollection, attorney Blackwell suggests that he dealt with approximately 1200 different

---

[3]Doc. 298.

grand jurors over his career, and there were at most 6 grand jurors who were members of an ethnic minority. He also states in this affidavit that no member of an ethnic minority ever served as grand jury foreperson over the 30 years that he was an assistant United States Attorney.

With all due respect, the court refuses to credit attorney Blackwell's statement that only 6 people of *any* ethnic minority served as grand jurors over his 30-year tenure. In any event, defendant continues to miss the real issue. If random selection by chance is to have any meaning at all, it is not the absolute number of individuals of a specific type who serve on a grand jury, but rather the chance or opportunity for any given individual to serve on the grand jury. Defendant is reminded that the Constitution does not require, much less guarantee, that his Grand Jury panel contain the same percentage of African-Americans as the percentage of African-Americans in the general population of the Northeastern Division of this district.[4] The Constitution requires only that the selection process used by the court be such that African-Americans have no less nor no more chance of being selected for jury service than any other ethnic group.

The 2000 Census records available on the Internet[5] reveal the following African-American populations for each county in this division expressed as a percentage of the total of the population of each county:

---

[4]"Defendants are not entitled to a jury of any particular composition." *Taylor v. Louisiana*, 419 U.S. 522 (1975) [*citing Fay v. New York*, 332 U.S. 261 (1947) and *Apodaca v. Oregon*, 406 U.S. at 413.]

[5]http://censtats.census.gov/cgi-bin/pct/pctProfile.pl

```
Carter        1.2 %
Cocke         2.2%
Hamblen       4.5%
Hancock       .6%
Hawkins       1.7%
Greene        2.2%
Johnson       2.4%
Sullivan      2.1%
Unicoi        .2%
Washington    4.2%

TOTAL         21.3% ÷ 10 = 2.13% Average[6]
```

This issue was addressed in 2008 by Chief District Judge Collier regarding the selection of Grand Juries in the Southern Division of this court.[7] In the Southern or Chattanooga Division, there was a l.47% difference between the number of African-Americans in the qualified jury wheel and the number of African-Americans in the general population. Chief Judge Collier found that such a differential did not constitute a *substantial* failure to comply with the Jury Selection and Service Act of 1968. Here, that differential was 0.89% regarding the master jury wheel filled on June 30, 2009, and 0.34% for the jury wheel filled in March 2005. *See*, Exhibits C and D to Mr. Medearis' affidavit. Those

---

[6]The census data obtained by the magistrate judge reflects a higher percentage of African-Americans in the Northeastern Division than does that census data appended to defendant's reply. The magistrate judge cannot explain the disparity. Further, according to the March 2005 JS-12, the percentage of African-Americans in this division was 2.20%. The June 2009 Form AO-12 also reflects that the percentage was 2.2%. The 2.2% figures were obtained from the Administrative Office, and ostensibly are based on the 2000 census. *See*, Ex. E, Medearis' affidavit. The court has no idea why there is a difference among the three census documents. In any event, since the larger percentage in Form JS-12 (2.2%) favors defendant, the court will use it.

[7]*United States v. Rejon Taylor,* No. 1:04-CR-160.

differentials, it must be remembered, presuppose that African-Americans compose 2.2% of the general population of the Northeastern Division of this court. Using the percentage of 2.13% as the 2000 Census indicates, then each of the differentials is even less. Regardless of the percentage figure used for the general population, the differences are significantly less than those for the Southern Division of this court.

Looked at another way, in Chattanooga the percentage of African-American jurors on the qualified jury wheel was 87% of the percentage of African-Americans in the general population of that division. In the Greeneville (Northeastern) division, the percentage of African-Americans on the 2005 qualified jury wheel was 84.5% of the percentage of African-Americans in the population in the relevant ten counties. If African-Americans comprise only 2.13% of the population in the Northeastern Division, as the 2000 census indicates, then the percentage rises to 87%. Suffice it to say, there is no *substantial* underrepresentation of African-Americans on the qualified jury wheel of this court since 2005.[8]

To be sure, there have been particular Grand Jury panels (and petit jury panels) in this division upon which there have been no African-Americans; the Grand Jury that indicted this defendant is an example. African-Americans comprise such a minuscule portion of the

---

[8]Defendant also attached to his reply brief *estimated* demographic information obtained from the Census Bureau. That estimated demographic information may or may not prove to be correct when the actual 2010 census data is tabulated and confirmed. But whether it proves to be accurate or not is again utterly beside the point. The real issue in this case is the *system* used by this court in the selection of jurors, both grand and petit. If the percentage of African-Americans have slightly increased in the intervening 10 years, it will be expected that the slight increase in the number of African-American jurors also results in succeeding years, although it bears remembering that much if not all the estimated increase likely is attributable to African-American children who have not yet obtained their 18th birthdays.

population in this division that it is not unusual for there to be no African-American on any given jury panel. The absence or presence of any African-Americans on a specific grand jury is a matter of blind chance; nothing about the procedure used by this court diminishes the chances for the selection and service of any particular person.

Defendant has filed to satisfy both the second and third prongs of the *Duren* test: the number of African-Americans placed upon the master jury wheel by random computer selection is reasonable in relation to the number of African-Americans in the ten counties of this division, and there clearly has been no "systematic exclusion" of African-Americans in the jury-selection process, either intentionally or unintentionally. Also, as already noted, there is no substantial underrepresentation of African-Americans on the jury wheels of this court. *Constaneda, supra*.

The appointment of the Grand Jury foreperson is strictly the prerogative of the presiding judge; in this case, the magistrate judge. No direct record of the race (or gender) of Grand Jury forepersons is maintained. But after expending no small amount of time and effort, a deputy clerk compared the names of Grand Jury forepersons of the last seven years with the personal information in the relevant jury questionnaires, which includes racial identity. For the last five panels, going back to June 2003, no African-American was appointed foreperson, although an African-American was appointed deputy foreman in June 2003. If defendant or his attorney takes the position that this manifests a racial bias by the magistrate judge, the only response is to categorically say that such is not the case; age, education, and work experience are the only criteria considered since the foreperson will be

required to preside over lengthy meetings and deal with a myriad of issues.

Even if it be assumed that this or any other judge improperly takes race into account in the appointment of the Grand Jury foreperson, "'the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment.'" *Ford v. Seabold*, 841 F.2d 677, 690 (6th Cir. 1988) (citing *Hobby v. United States*, 468 U.S. 339 at 345.)

It is respectfully recommended that defendant's motion to dismiss the indictment (Doc. 220) be denied.[9]

Respectfully submitted,

    s/ Dennis H. Inman
United States Magistrate Judge

---

[9]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).