IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 2:09-CR-045 |
| | ) | |
| SUNNAH MADDOX | ) | |

**MEMORANDUM AND ORDER**

The defendant has filed a "Second Motion to Suppress Fruits of Unconstitutional Search" [doc. 532], to which the government has submitted a response [doc. 547]. The court conducted a suppression hearing on December 1, 2010, during which the testimony of Virginia State Police Sargent Andrew Metro was heard. The court has thoroughly reviewed the video recording of the traffic stop at issue, along with the contemporaneous Investigative Report completed by Sargent Metro. For the reasons that follow, the defendant's motion will be granted.

I.

*Background*

On May 25, 2005, the defendant was traveling northbound on Interstate 81 in Botetourt County, Virginia. He was a passenger in a red Acura driven by Jacquetta Benson. Sargent Metro stopped the Acura because he could not see a license plate affixed. As he approached the Acura on foot after the stop, Sargent Metro observed a paper license tag taped to the rear window. The vehicle was subsequently searched, resulting in the discovery of $16,045.00 in cash. The defendant now moves for the exclusion of all evidence pertaining

to the traffic stop, arguing that the search violated his Fourth Amendment rights.

The stop occurred at approximately 12:10 p.m. The video recording confirms that the paper tag was barely visible in the rear window. Sargent Metro obtained Ms. Benson's driver's license at the commencement of the stop. At approximately 12:11:15, the defendant told Sargent Metro that the Acura belonged to Ms. Benson's boyfriend, Jamie Rush. At approximately 12:11:20, Sargent Metro stated, "I'll be back in a second" and he returned to his patrol car.

Sargent Metro went back to the Acura at approximately 12:15:30 and began questioning the defendant (the passenger). Sargent Metro asked the defendant for identification at approximately 12:15:45. The defendant responded that his driver's license was suspended. The defendant promptly gave his real name when asked, and Sargent Metro again returned to his patrol car at approximately 12:18 to conduct a criminal background check.

Following the sound of what appears to be a ringing telephone, the microphone recording the traffic stop cuts off at approximately 12:22:42 and stays off until approximately 12:30. At 12:30, Sargent Metro received information that the defendant has a criminal history involving drugs. At approximately 12:31, the defendant exited the passenger door of the Acura and approached the patrol car. At 12:31:30, Sargent Metro exited his vehicle and began a conversation with the defendant as the two men were standing between the two cars.

Sargent Metro asked the defendant if he had been arrested before, and the defendant admitted that he had. Within three minutes, Officer Metro commented, "When you have a history, you know, it's a propensity to do it again." [12:34:07]. In the context of asking permission to search the Acura for drugs and weapons, Officer Metro further stated, "But it's hard for people to change. They seem to fall back into the same old thing, and that's why I'm asking." [12:34:30]. The defendant refused to allow a search of the car, and at approximately 12:35:15 Sargent Metro announced that he was calling for a drug dog.

At 12:36:25, Sargent Metro disclosed that "everything else checks out alright with the registration." He had given Ms. Benson's driver's license back to her at about the same time, had been out of his patrol car since 12:31, and thus would have had registration confirmation prior to that point.

At 12:37:40, Sargent Metro tells another officer on the scene that he had called for a drug dog because of the defendant's "extensive drug history." An officer begins running the drug dog at approximately 12:39:30. The dog alerted on the Acura. At approximately 12:40:30, Sargent Metro told the defendant that probable cause now existed. An extensive search of the vehicle and its contents began at approximately 12:42, lasting about an hour.

Midway through the search, Sargent Metro was informed that the Virginia State Police had been contacted by Detective Sam Surano who was investigating the defendant's alleged criminal activities in New York. At approximately 13:21:45, Sargent

3

Metro phoned Detective Surano. At approximately 13:25:45, Metro told Surano, "We ran his criminal history, that's the reason I wanted to search it [the Acura]." Immediately after the conversation with Surano ended, at approximately 13:28:15, the recording microphone again shut off.

As noted, Sargent Metro filled out a contemporaneous Investigative Report. The report states that after not observing a license plate on the Acura, he stopped the car "to inquire about the registration of the vehicle." The report goes on to provide that

    1. Sargent Metro asked Maddox for identification, which Maddox did not have.

    2. Sargent Metro checked Maddox's license status and criminal history after obtaining his name and date of birth.

    3. Sargent Metro learned that Maddox has "an extensive criminal history for drug and weapon violations."

    4. Sargent Metro asked Maddox if there were drugs or weapons in the vehicle, and Maddox stated there were not.

    5. Sargent Metro asked Maddox for permission to search the car. Maddox refused.

    6. Sargent Metro "had a narcotics canine available and instructed Trooper Brown to utilize his canine on the exterior of the vehicle."

    7. The dog alerted. The officers searched the car and found a large amount of cash ($16,045.00).

    8. "During the course of this investigation," Sargent Metro "contacted Detective Sam Surano with Utica PD" and was told that Maddox was under investigation. Surano advised that he had been informed Maddox would be traveling from Johnson City to Utica with crack cocaine "in a red Acura accompanied by a black female." Surano also indicated where Maddox "liked

to hide crack cocaine."

II.

*Analysis*

The defendant argues that evidence discovered in the search of the Acura should be suppressed because the search was not supported by a reasonable suspicion that criminal activity was afoot. The court agrees.

An officer may stop a vehicle if he has probable cause to believe that a civil traffic violation has occurred. *See United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The paper license tag taped to the inside of the Acura's rear window, barely visible, provided that probable cause. *See* Va. Code Ann § 46.4-716.

However, "[o]nce the purpose of a traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Blair*, 524 F.3d at 752 (citations and quotations omitted). In other words, "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). To detain a motorist (or, in this case, a passenger) longer than is reasonably necessary to resolve the purpose of the traffic stop, the officer must have reasonable suspicion of more extensive criminal conduct. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Without reasonable suspicion, "all the officer's actions must be reasonably related in scope to circumstances justifying the

5

original inference." *Id.* (citation and quotation omitted).

Whether an officer had a reasonable, articulable suspicion must be determined under a totality of the circumstances analysis. *See United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). "[D]ue weight must be given, not to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27; *accord Smith*, 263 F.3d at 588. Evidence offered in support of reasonable suspicion must be considered under "a common sense approach, as understood by those in the field of law enforcement." *Smith*, 263 F.3d at 588. However, "[t]he court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely." *Townsend*, 305 F.3d at 541.

In responding to the instant motion, the government cites four factors which it insists combined to provide reasonable suspicion. [Doc. 547, p.4]. Those considerations are:

> 1. "that the defendant had an extensive criminal history including drug and weapons charges"
>
> 2. "that the defendant had recently been released from custody for possession of narcotics"
>
> 3. "that the vehicle was not registered in either the defendant or the driver's name"
>
> 4. "the vehicle was being operated on a known drug corridor, I-81."

6

As to the last of these considerations, the court must of course credit to some degree Sargent Metro's observation that criminals sometimes transport drugs on Interstate 81, but the same can unfortunately be said of virtually every highway in our nation. As the court reviewed the video recording of the stop, it witnessed hundreds upon hundreds of passing vehicles presumably traveling for legitimate purposes. Traveling on Interstate 81 is not an inherently suspicious activity, and under a totality of the circumstances analysis this factor supports reasonable suspicion in only a minor way. *Cf. United States v. Arvizu*, 534 U.S. 266 (2002) (defendant stopped after traveling on unpaved and "primitive dirt" roads near the Mexican border, commonly used to avoid checkpoints); *see also Blair*, 524 F.3d at 751 ("Officer Holmes did not have reasonable suspicion to suspect Blair of criminal activity simply because he was driving in a bad neighborhood at 10:30 at night.").

The court next turns to the proffered justification that the Acura was not registered to either the defendant or Ms. Benson. It is noted that Sargent Metro was immediately, and honestly, informed of the vehicle's ownership. As he acknowledged at 12:36:25, "everything . . . check[ed] out alright with the registration." The officer had that information either by 12:15 (when he returned to the Acura to begin grilling the defendant passenger) or by 12:31 (when he exited the patrol car to continue grilling the defendant passenger). It is impossible to know precisely when the registration issue was resolved because the recording microphone went silent for eight crucial minutes.[1] Regardless, Sargent

---

[1] Presumably, any question was answered quite quickly, because after Ms. Benson gave the
(continued...)

7

Metro certainly had the information by 12:31 because he left his vehicle and was out of communication after that time. *See Blair*, 524 F.3d at 752 (the purpose of the traffic stop would have been completed "almost immediately" after the officer had all the necessary information pertaining to the reason for the stop). Sargent Metro nonetheless continued to detain the defendant and Ms. Benson, making comments such as, "When you have a history, you know, it's a propensity to do it again" and, "But it's hard for people to change. They seem to fall back into the same old thing, and that's why I'm asking." *See Terry*, 392 U.S. at 18 ("The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.") (citations and quotations omitted). Under a totality of the circumstances analysis and on the facts of this particular case, the basis for the initial stop (vehicle registration) supports a reasonable suspicion of criminal activity in only a minor way.

Ultimately, and quite obviously, it was the defendant's criminal history that caused Sargent Metro to suspect that misconduct was brewing. Prior to the canine search, Sargent Metro told another officer that the detention was due to the defendant's "extensive drug history." After the fact, he similarly told Detective Surano, "We ran his criminal history, that's the reason I wanted to search it."

---

[1](...continued)
officer her driver's license, he stated colloquially, "I'll be back in a second." Further, Sargent Metro testified that the tag/registration issue was resolved as soon as he looked at the registration paperwork and compared it to the paper tag.

"[P]ast criminal activity is a factor that can be taken into consideration." *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003). However, "a person's criminal record alone does not justify a search." *United States v. Payne*, 181 F.3d 781, 790-91 (6th Cir. 1999). A criminal record, "by itself, does not create a reasonable suspicion that criminal activity is *currently* afoot, which is what [*Terry*] requires." *Joshua*, 341 F.3d at 446 (emphasis in original).

Having analyzed the totality of the circumstances of the instant search, the court concludes that the defendant was detained longer than was reasonably necessary to resolve the purpose of the traffic stop. On the facts of this case, the defendant's criminal history plus two minor considerations (vehicle registration and I-81 as a "known drug corridor") did not provide reasonable suspicion to justify the extended detention. *Cf. id.* (criminal history plus nervousness and "illogical" travel route did not combine to create reasonable suspicion.).[2]

---

[2] The court notes that in his testimony Sargent Metro offered four additional facts which purportedly raised reasonable suspicion in his mind: (1) that the Acura was registered to a third party, thus suggesting that the car was being used for drug transport; (2) recently purchased vehicles, which the paper tag showed the Acura to be, are often used for transporting drugs; (3) that the defendant had no identification; and (4) that the proffered reason for Ms. Benson and the defendant's travel (that Ms. Benson was driving the defendant to New York for his son's birthday and then soon returning to Tennessee) was suspicious. The court cannot significantly credit Sargent Metro's testimony regarding these facts as they are inconsistent with the contents of his Investigative Report and, more importantly, are inconsistent with his repeated on-the-scene affirmations that the search was conducted because of the defendant's criminal history. Again, "[t]he court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely." *Townsend*, 305 F.3d at 541.

In isolation, the canine alert gave probable cause to search the Acura. However, as in *Joshua*, reasonable suspicion did not support the extended detention that allowed that search to take place. *See id.* at 447 ("[T]he patrol dog's alert on the vehicle does not satisfy the Fourth Amendment inquiry, if . . . reasonable suspicion to detain [the defendant] did not exist until the dog alerted on the vehicle."); *see also Smith*, 263 F.3d at 594 ("In fact, it seems that it was Steven's refusal of consent to search which triggered Officer Fulcher's decision to use the narcotics dog. That refusal is clearly not an appropriate basis for reasonable suspicion.").

III.

*Conclusion*

Based on the totality of the circumstances, the court concludes that Sargent Metro did not have a reasonable, articulable suspicion of criminal activity sufficient to extend the scope and duration of the traffic stop in this case. The stop was initially permissible, but the detention of the defendant until the canine unit arrived was beyond the time reasonably necessary to investigate the Acura's registration. Absent a reasonable, articulable suspicion of criminal activity by the time that Sargent Metro called for the canine unit, the scope and duration of the stop was extended beyond what was necessary and the Fourth Amendment was violated. *See Blair*, 524 F.3d at 752.

The defendant's "Second Motion to Suppress Fruits of Unconstitutional Search" [doc. 532] is therefore **GRANTED**. All evidence pertaining to the May 2005 traffic

stop discussed herein is **SUPPRESSED**.

        **IT IS SO ORDERED.**

ENTER:

        s/ Leon Jordan
    United States District Judge